The Fundamental Issue in this case is straightforward. After the FDA approves a human drug for sale, does it then have authority to influence or interfere with how that drug is used within the doctor-patient relationship? The answer is no. Nearly 40% of prescriptions in the United States are for off-label use. This is, and always has been, an integral aspect of the practice of medicine. That is precisely why the FDA cannot interfere. In fact, Congress has expressly forbidden it. The Supreme Court in Buckman was clear that the FDA cannot intrude upon decisions that are statutorily committed to the discretion of healthcare professionals, and that 21 U.S.C. 396 prohibits anything that would even deter off-label use. That's a bright line that the FDA cannot cross. The FDA has nonetheless engaged in a years-long campaign to stop the use of ivermectin to treat COVID-19, even though that drug remains fully approved for human use. What do you do with the argument that 396 applies to legally marketed device, where a sulvey does mention it in the context of a drug, so that is our case, but the District Court went into some length about a C-site and all of this. What do you do about that? The first response is that this isn't the only court that has used Section 396 in that manner. There are at least six circuits and multiple District Courts that have applied 396 to drugs. Would we create a circuit split if we were to say 396 does not apply to drugs? At the very least, this Court would then be in tension with the five other circuits. Because all of the other ones have, have any circuits said that it's not? I have not seen any cases that say that it only applies to devices and has no implications. Do you have any comment on the merits of it, apart from what other people have said? At the very least, even if this Court were to decide that 396 does not apply to devices, it at least reflects an understanding by the Courts that nothing in the, that the same principle applies to drugs. What's your best argument that 396 does apply to drugs? The best argument we have is that that's how Courts have been uniformly interpreting it. When, when Congress was presented with this issue and when they passed the bill, that was the understanding for Congress. That's been the understanding of the FDCA, understanding of the FDCA and of the authority of the FDA for over a hundred years. So looking at history, looking at the, looking at history itself, looking at the text of the statute and nothing in it provides authority for the FDA to interfere with drug use, off-label. All, every single one of these factors points in the same direction. What is, if, if for some reason we were to determine, and I'm not foreshadowing, that 396 only applies to medical devices, how do you win otherwise? The FDCA still does not give the FDA authority to interfere with drug use. The FDA can approve drugs for use in the United States, sorry, to interfere with off-label prescriptions. The FDA can approve drugs for use in the United States, but nothing in the, in its organic statute, nothing that Congress has passed authorizes the agency to give medical advice. Nothing authorizes it to give recommendations or advice about how those drugs are to be used in the doctor-patient relationship. So even without 396 you think would be a prohibition, but even if the prohibition doesn't apply, there's no allowance by Congress? That is correct. Oh, that's, okay. That is correct. Agencies are creatures of Congress. They cannot act unless authorized, and there is nothing here that authorizes the agency to take the actions that it did. How does the recent Alliance case that you cited in your, how does that affect the doctor's standing to bring suit against the FDA? The, um, the procurement opinion that was recently issued by the court? In that case, um, yes. The, the panel, the panel in that case recognized that, um, that the actions by the agency can have implications for doctors and can burden their practice of medicine even when the agency is not directly regulating the doctors themselves. And so by interfering with the practice of medicine or authorizing actions elsewhere, that might in turn inhibit the doctor's ability to practice. It might cause an increased, um, it might cause increased, uh, stress on their practices. It causes an influx of patients. It causes difficulty dealing with their patients. Um, it, it stands for the proposition that the FDA, even though not directly trying to regulate the doctors, can nonetheless, um, harm them in ways that provide for their standing. Oh, the doctors would have standing? Yes, that is correct. So, the district court did not address standing and instead only opined on sovereign immunity. Assuming, arguendo, that you were able to overcome this sovereign immunity here, should we remand to the district court and to let the district court consider the, uh, standing issues in the first instance? We think the standing in this case is pretty straightforward and is very clear, in which case this court can just resolve that issue so the case can proceed. If this court does have any doubts about standing, particularly that would apply, that would require applying, um, some sort of, um, weighing, that would require weighing facts, that would require construing facts, then the case should be remanded to the district court to resolve that issue. Are stand-alone ultra-virus claims available? Um, the district, the D.C. Circuit has said that they are not unless there's no alternative procedure for review of a statutory claim, in its case, Chonji versus Raimondo. Um, are we, do we differ from the D.C. Circuit in that regard and, um, and does it matter for this case? Um, it, it doesn't matter in this case to the extent that the claims will still proceed, that they, um, that they've been pled under this freestanding ultra-virus doctrine and as an ultra-virus claim, um, that can proceed under the waiver of sovereignty under the APA. Um, I, I apologize, it's the court asking about the waiver of sovereign immunity for ultra-virus or something different? Right, we're asking, I'm, I'm asking if you can have an ultra-virus claim separate from the APA. Is the freestanding ultra-virus claim available in this case or in any other case? Ultra-virus claims are still available under Section 1331 in the court's general jurisdiction over federal claims. Um, they're regularly recognized. As, as far as the, the waiver of sovereign immunity goes, um, the, that has been an exception, or sorry, not waiver, the exception of sovereign immunity, that has been an exception for over a hundred years. Um, the D.C. Circuit, to the extent they've expressed doubt that that's a separate waiver of sovereign immunity, the Fourth Circuit and the Sixth Circuit recently, within the last two years, have both reaffirmed that, that exception of sovereign immunity still exists. This court has never taken the position that that exception of sovereign immunity does not exist. Um, and so it would be consistent with this court's precedent to continue to apply it. This, the, the government drops in a footnote that that might not be the case, that hasn't, that argument hasn't been raised by the government. Um, and the, we don't believe the court should be, um, asserting sovereign immunity in a manner that hasn't been asserted by the government itself. Where do you think the district court erred? The district court erred first and foremost on the ultra-virus doctrine and, and the ultra-virus exception to sovereign immunity. Um, for over a hundred years there's been a clear line that the FDA cannot give medical advice, but in this case it played doctor and did so anyway. By its own admissions and its briefs, it made recommendations, it gave advice. Um, if you look at the Judge Rottenham opinion from the D.C. Circuit, um, the D.C. Circuit was pretty explicit that that sort of behavior, um, that those recommendations are at the heart of the practice of medicine. This is something the FDA has never been able to do and it's a bright line. So you think it's just this particular type of advice? If the FDA were to give dating advice or something on its, on its website or on Twitter or something, would that be, would you be able to bring an ultra-virus claim or is it only when it's in the wheelhouse of providing medical advice? If the FDA were giving dating advice on its website, then that too would be ultra-virus. You would have a separate issue of standing, an injury that would need to be overcome. The more important observation though is that in this particular case, the FDA was overstepping its bounds in an area that was adjacent to where it exercised a significant federal authority. So people think it has the power. Yes, the FDA was intended to. The site of the FDA said don't do this. It was the first citation that every single one of those cases gave as to why they weren't going to approve ivermectin use in hospitals. Yes, that's correct. Okay, what about, are you saying this applies to any agency or are you just saying it applies to the, to this agency? You know, what if the, the Park Service gives Smokey the Bear advice about not starting forest fires? Is that ultra-virus? What, what is the line for what is ultra-virus speech? You said the dating advice would be by this agency, but there might be a standing problem. What government agencies do speak about all sorts of things. What, tell, can you articulate a line as to when it's actionable? I guess I should qualify my response to the dating advice question. Perhaps the FDA has some statutory authority I don't know about that would allow dating advice. Each of the, each of these individual questions though are going to be dependent upon the agency that is, that is taking these actions and the statutory authorization they have for them. I don't know, I'm not familiar enough to know whether or not agencies can speak on behalf of or through Smokey the Bear, but each agency will be different based upon what Congress has authorized it to do. In this case, Congress has not authorized it to give medical advice or recommendations or to interfere with the practice of medicine, to interfere with off-label drug use. That's a longstanding principle that hasn't changed. Does it interfere with the practice of medicine to share information versus issuing a kind of directive? The, I think the government has gone to great lengths to insist or classify all of its actions here as merely informational. We don't dispute that the FDA could put out a health and safety notice saying that it has received adverse reports about the use of a drug. We don't dispute that the FDA could say whether or not a drug is approved for particular uses. Right, so we could say ivermectin is not approved for treating COVID-19. That's just information sharing, not actionable. Yes, and that has never been the position. The plaintiffs have never challenged those statements. But no, don't is where it gets over the line. The clearest examples of where they have gone over the line are when they say things like, you are not a horse, you are not a cow. Seriously, y'all stop it. Stop it. No, stop it. Patients should not use ivermectin for COVID-19. Also a problem. That would be a directive. Interfere with the practice of medicine, forbidden. That is correct. Should I use ivermectin for the treatment of COVID-19? No, that is another directive. Once the agency transgresses into medical advice, once they transgress into recommendations, they are not information sharing. They are acting. What if agencies only share some information that paints a bleak picture or paints a particularly rosy picture and doesn't share other information? Is that a problem? There's been significant criticism that the FDA statements not only issued directives and recommendations they could not do, but they were also intentionally trying to paint ivermectin as a particularly dangerous drug, or they were only presenting one side of the facts. Is that actionable? If you share information selectively, that seems a lot harder to monitor. It does seem a lot harder to monitor to the extent that they are, you know, they are misleading. It's not what the petitioners are challenging. Very specific, concrete statements. So you're not saying they just were misleading because they failed to say all the many times that ivermectin helped in this circumstance? No, we have not raised that argument. Okay. We have stuck strictly to the breadth. Because some of the amici talk about that. Yes. The amici provide, I think, very relevant color to this case. Just to understand the background of what's going on, ivermectin is one of the most famously safe drugs in history. But we are not here to determine whether ivermectin is safe or unsafe or for people or for horses or that's not, that's beyond the scope of the court. Well, the court should take notice that it is a human drug. That it's a human drug that is approved for human use. Correct. This case is not about whether ivermectin is effective against COVID-19. We've presented the court with a very clear legal issue. When you focus on, pardon my scratchy voice, when you focus on the alleged job loss of the two physicians, Dr. Bowen, Dr. Merrick, when you focus on the alleged job loss in light of the distinction we talked about earlier between advising and informing or information sharing and directives, do you as plaintiff's counsel need to allege that this economic injury, the job loss to these two doctors traces to FDA's directive, their advice, rather than to FDA's information sharing? Does that make sense? I think at this stage in the proceeding, the standard is plausibility. And so as long as we have alleged that it comes from the FDA and it's overstepping to the precise question I believe you're asking. But does your complaint sort of specifically allege that the economic loss, the reputational damage, the job loss damage traces not just to FDA's sort of information sharing or advice, but traces to their directives? Because that is what interferes with the practice of medicine. In this case, they're inseparable. The FDA came out very clearly in its most prominent document, which is maintained on its website and has been now for over two years. It's called why you should not use ivermectin to treat or prevent COVID-19. So to the extent there is some question about whether or not this was the information sharing versus the advice or recommendations of the agency, I think in this case that's indistinguishable because the agency has gone to such great lengths to make sure that it was pushing its medical advice or that it was pushing its perception of how the drugs should be used, that it was job owning. So if there was a concern that your pleading was perhaps vague on that point, and I'm not saying that it was, you would be readily able to amend to say it was a directive, not why you should not use. If there was a concern that your pleading was vague. If there was a concern, we could amend the completings or we could- And I'm not saying there is. Also the doctors in this case have suffered numerous injuries. We were explained to the court that they were removed from their positions because of the directive of the FDA. But do you think it's but for causation? Do I think it's but for that they were removed from their positions? Because of the directive of the FDA. The plaintiffs in this case absolutely believe that. Was it a directive or a recommendation? In this case, I think it's indistinguishable, but some of the issues coming out of the FDA were directives, some of them were recommendations. The harm significantly accrued to the appellants in this case, the doctors, after the Twitter campaign and after the Facebook, Instagram, social media blitz that the FDA engaged in. Thank you. You saved time for rebuttal. Thank you. Good morning and may it please the court. Ashley Honnold for the United States. This case is about informational statements made by the U.S. Food and Drug Administration to inform consumers about the dangers of using certain drugs. FDA made these statements in response to multiple reports of consumers being hospitalized after self-medicating with ivermectin intended for horses, which is available for purchase over the counter without the need for a prescription. FDA did not purport to require anyone to do anything or to prohibit anyone from doing So what about when it said, no, stop it? Why isn't that a command? That seems to me, if you were in English class, they would say that was a command, stop it. That is different than we're providing helpful information. Your Honor, the language that the FDA used in these tweets were merely quips, and I don't think that these quips changed the substance of FDA's statements. Is that a command? Stop it? The tweets about the horse ivermectin were intended to advise consumers that they should not use ivermectin intended for animals and that this could be unsafe. I'm sorry, can you answer the question, please? Is that a command? Stop it. Your Honor, in some contexts, those words could be construed as a command, but in this context, where FDA was simply using these words in the context of a quippy tweet meant to share its informational article, those statements do not rise to the level of a command. Plaintiffs concede that it was proper for FDA to identify what ivermectin is FDA authorized for. It's FDA approved for certain conditions like skin conditions or parasites, and it's not FDA approved for treating COVID. What other drugs does the FDA provide information on that says that it's not approved for other uses? Sure. FDA makes these kinds of statements all the time, and I'm happy to give the Court a few examples. Please do. For example, FDA can warn the public that drugs like opioids are highly addictive and can be dangerous. Although there are FDA authorized uses for opioids, there are also dangerous uses, and FDA has to be able to tell the public in its scientific view that some uses are dangerous. Does it have a scientific view? Has it been through any type of scientific testing or notice and comment or any sort of doctor review at the FDA that would be a basis for these comments? Yes, Your Honor. The FDA does have a scientific view. It's charged by Congress with ensuring that medical drugs are safe and effective, and What did it do about ivermectin before issuing these types of informational warnings? Your Honor, I don't think there's anything in the record that specifically tracks FDA's process, but for FDA to share information with the public that in its scientific view there are dangers with using certain drugs, as evidenced by multiple reports of consumers being hospitalized after self-medicating with ivermectin intended for horses. Does the FDA have any authority, legal authority, to regulate off-label uses of prescription drugs, which is what this would be? What gives them that authority? Your Honor, FDA has multiple overlapping sources of authority that I'm happy to walk through that gives FDA authority to convey information to the public, but here FDA was not regulating the off-label use of drugs. These statements are not regulations. They have no legal consequences. They don't prohibit doctors from prescribing ivermectin to treat COVID or for any other purpose. Quite to the contrary, there are three instances I'd like to point the Court to in the record that show that FDA explicitly recognizes that doctors do have the authority to prescribe ivermectin to treat COVID. What is the answer to Judge Clement's question? What authority do they have to either recommend or not recommend off-label uses? To say that they weren't doing that is not the answer. There are multiple sources of authority for FDA's statements here. So FDA is charged by Congress with protecting the public health and ensuring that regulated medical products are safe and effective. So we can say, give recommendations about off-label use because it's charged by Congress with health? Yes, Your Honor. FDA has inherent authority to further its mission by communicating information to the public about safe uses of drugs. And just to share another example, last fall there was a TikTok challenge that encouraged consumers to cook their chicken in NyQuil, in a cough syrup. And FDA put out a statement saying, this is not an FDA-authorized use of the drug. This is an off-label use and it's not safe. FDA has to be able to make these kinds of statements, these kinds of public safety statements. And under plaintiff's theory, FDA would not be able to communicate to the public in this way. Is the FDA ever responsible for making these public statements? If they make statements that are false or grossly misleading or wrong, can they ever be held responsible? Or are they allowed to make statements, whatever statements they want, without any oversight or ability to come against the FDA? Are they immunized for all of their statements? The FDA is not immunized. Well, I thought that we're here for sovereign immunity. So can they be held responsible when they make statements, assuming arguendo that statements are grossly misleading, incomplete, factually, scientifically wrong, with intent or negligently or grossly negligently or reckless? Can they be held responsible or liable? Your Honor, it's not the role of the courts to police the statements of an agency charged by Congress with making sure that drugs are safe and effective. So is the answer no, they can't be held responsible? What is the answer to the question, please? Can they be held responsible if they make grossly incorrect statements, either due to recklessness, intentional behavior? Can they be held responsible or not under the law? I'm not asking what's morally right or good. I'm asking, what does the law say? The law does not say that it's the role of the courts to police the scientific statements of the FDA. So is the answer no, they can't be held liable in court, no matter whether their statements are false or true? Is that the answer? If that's the answer, then just say it. Your Honor, that's the answer if the statements are merely communicating information to the public. So no matter what the information is, and no matter whether it's false or it leads to even deaths, and I'm not saying this case is that, I'm saying, hypothetically, they can't be held liable. That's correct. So they're allowed to by Congress, but Congress, but someone has immunized them from being liable. Is it Congress? If the FDA is merely making informational statements, they do have sovereign immunity. There is no waiver of sovereign immunity under the ultra-various doctrine or the APA. There can be circumstances if FDA is issuing formal regulations. These regulations may be challenged under the APA, but that's a different circumstance than what we have here. It would be extraordinary for this court to conclude that FDA needs explicit statutory authority merely to speak to the public. Agencies talk to the public all the time. That's how the government communicates with its constituents. They talk to the press, they go to conferences, and they send speakers to speak on behalf of the agency. They issue statements on social media, and agencies need to be able to speak to the public like this. They have inherent authority to do so under Section 393 of the Federal Food, Drug, and Cosmetic Act, and Congress also gave FDA explicit authority to make exactly these kinds of statements. In Section 375B of the Federal Food, Drug, and Cosmetic Act, and Section 242-0 of the Public Health Services Act. But you can see the FDA has no authority to issue medical advice, correct? That's not arguable, right? FDA cannot issue medical advice. No, Your Honor. The government isn't conceding that in this case. You believe the FDA does have authority to issue medical advice? The FDA is charged by Congress with making sure that drugs are safe and effective, and FDA is entitled to have a view about whether drugs are being used in a way that is safe and effective, and if there are examples in the world, as there were here, of consumers using drugs in ways that were not safe and that were leading to hospitalization, it is not only permissible, it is imperative that the FDA be able to inform the public of its scientific views about safe uses of drugs. Does it matter whether they're scientific views or not? Whether they've been tested scientifically, or whether they are just views? Does that matter? Your Honor, there's nothing in the multiple sources of authority that I cited that require the FDA to go through any sort of formal process. Can they give a dating advice, or only advice about drugs? Because Congress has charged the FDA with protecting the public health by ensuring that drugs are safe and effective, FDA can give information and advice about drugs. I'm not aware of anything that... But that wouldn't be medical advice, right? You're not authorized to give medical advice. I think the line is, what's the line between giving advice about drugs, as you put it, and medical advice? So I think it would be helpful to look at the statutory text of Section 393, if that's what Your Honor is asking about. To start, 393 specifically refers to devices and not to drugs. And 396 discusses the authority of a doctor to prescribe. None of FDA's statements here interfered with the authority of doctors to prescribe ivermectin. On page 973 of the record, this is the September 2021 article, FDA says, if your health provider writes you an ivermectin prescription, fill it through a legitimate source, such as a pharmacy, and take it exactly as prescribed. On page 974, FDA recommends that consumers talk to their health care providers about available COVID treatment options. And they explain that your provider can help you determine the best option for you based on your health history. On page 976, this is the April 2020 FAQ, FDA advises consumers not to take any medicine to treat or prevent COVID unless it has been prescribed to you by your health care provider and acquired from a legitimate source. FDA is clearly acknowledging that doctors have the authority to prescribe human ivermectin to treat COVID, so they are not interfering with the authority of doctors to prescribe drugs or to practice medicine. I agree there's plenty of statutory authority that empowers FDA to issue information. I don't think there's any question about that. The question is, is there any colorable authority that authorizes FDA to issue recommendations to provide medical advice beyond information sharing? There are. FDA does not need to identify any specific statutory authority to simply speak to the public in this way. And even if section 396 did apply here, whatever interfere may mean, it can't mean that FDA is barred from sharing its scientific views about public safety dangers. Under plaintiff's theory, FDA would not be able to advise the public that opioids can be highly addictive and dangerous. It would not be able to advise the public that they should not cook their chicken in NyQuil because this is not a safe use of a cough syrup. As another example, FDA has issued a statement explaining that lidocaine, a numbing agent, should not be used off-label for teething babies because this can cause seizures and deaths in babies. And FDA advised that this was not a safe off-label use of this drug that it regulates. But when you say, should I take ivermectin to prevent or treat COVID-19, a, answer no. And it doesn't have all those caveats about the prescription and what all of that because they don't always have the attachments. But the next sentence in that statement says, no, you should not take any drugs unless they've been prescribed to you by your doctor. And just to take a step back, this court has explained in Danos v. Jones that even assuming the ultra-various exception to sovereign immunity is still viable, there is a very high bar for invoking this exception. Plaintiffs must show that the agency was acting without any authority whatsoever or without any colorable basis for authority. And given plaintiffs' concessions about what it is proper for FDA to say about the informational statements about what ivermectin is FDA approved for, what it's not FDA approved for, and that it's appropriate for FDA to notify the public about consumers getting sick, this is far from meeting the very demanding standard for the ultra-various exception. The fact that we're even talking about specific statutory authority for FDA to make these statements is a very high bar.  any colorable basis for its authority. I have two questions. The first one is, if we were to determine that the district court erred regarding sovereign immunity, should we remand the district court in the first instance to deal with standing, or should we address standing? That's the first question. You can go ahead, and I'll ask the second one in a second. Your Honor, standing is a legal question that this court can address in the first instance, so there is no requirement that the court remand to the district court, but of course the court could remand to the district court if it preferred. The opposing counsel cited the Alliance case regarding standing. Do you have anything to add on that? Yes, Your Honor. As we explained in our 28J letter, the Alliance decision, first of all, it's non-precedential. It was overridden by a Supreme Court stay, but even on its own terms— It's what? It was overridden by a Supreme Court stay, and it's non-precedential. Overridden by a Supreme—okay. Thank you. I just— And even— I didn't—I'm sorry. I just didn't understand what you were saying, so I got it. And even on its own terms, the reasoning of that decision does not support standing here. The Alliance panel concluded that the plaintiff doctors had standing on the grounds that FDA's actions caused those plaintiff doctors to treat certain patients in ways that resulted in harm to the doctors. But here, plaintiffs have not alleged that FDA's statements forced them to provide medical care in ways that harmed them. And both the allegations and the— Okay, so you think that they didn't allege that the FDA's statements caused them a problem? No, plaintiffs have not alleged that FDA's statements forced them to provide medical care in a way that harmed the doctors. The allegations in the complaint— You don't disagree that Dr. Bowen suffered reputational injury? No, we don't— Or that Dr. Bowen and Dr. Malik suffered economic injury from losing their jobs. You don't dispute the fact of their injuries, do you? No, the government is not disputing injury in fact in those examples, but those injuries are not traceable to the FDA's statements or redressable by an order declaring FDA's statements unlawful. Even if this court concluded that the parts of the statements that said stop it or should or no were unlawful, the remaining parts of the statements that merely provide information would still be available, and plaintiffs have not shown that it's likely that these third parties would rescind their actions that harmed plaintiffs. I see that my time is up. Well, I do still have that one question, but I have another question now. When you said it's not traceable or redressable, once the FDA has become aware that courts around the country are relying on the FDA to keep hospitals from allowing doctors who have privileges there from prescribing these drugs and also aware that major pharmacies are refusing to fulfill these prescriptions based upon the FDA's statements, and so it becomes aware that it is allegedly interfering with the doctor-patient, does the FDA have an obligation to speak again to clarify things so that people are not relying upon the FDA statements in this doctor-patient relationship? That's one question. No, Your Honor. Those pharmacies and those hospitals are sophisticated, independent third parties who are not controlled by the FDA. But the courts are saying the FDA is why we're not going to order the hospital to let the doctor give the prescription. I'm not sure which court decisions— There's five or six of them, and it sometimes cites other health groups as well as the FDA. It's not just the FDA. It's a whole—but the FDA is prominently featured usually first in these opinions. They're cited at length in the briefing. But that's okay. If you don't know, then we'll just move on to the last question I have. Go ahead. If I may respond? Sure. So as Your Honor noted, there are many other scientific organizations who have made these statements about ivermectin in addition to the FDA. And I'd like to point the court to page 1149 of the Record on Appeal. So one of the plaintiffs, Dr. Merrick, alleges that he was forced to resign from his position at Sentara Norfolk General Hospital for promoting ivermectin as well as other drugs. But the statements from Sentara telling its hospitals to stop prescribing ivermectin, they cite statements from these other scientific organizations in addition to the FDA. And because all these statements are available, plaintiffs have not shown that the injuries caused by third parties are traceable to the FDA or redressable by an order declaring these FDA statements unlawful because they're— Is that beyond the scope of 12B? And that you can argue that at summary judgment? And then they can argue that maybe you're all talking together and it's hard to, you know—and maybe it is a traceability problem, though. No, Your Honor. This is not a merits question that should be saved for summary judgment. Standing is clearly jurisdictional and it is clearly something that needs to be established for plaintiffs to make it past the 12B motion to dismiss stage. And plaintiffs have to allege facts that establish not only that it's possible that their injuries would be redressed by the order they're seeking, they have to establish that it's likely and they haven't met their burden to do so here. Okay, my last question, which was from earlier. If you're correct and courts do not have any role to play as long as the FDA is speaking informationally, then who or what would prevent or would correct if the agencies are giving out false information? And I'm not saying that there's false information here. And is that if you believe that the courts just are not well-suited to it or that the ultraviolet doctrine doesn't give it, then who does? Your Honor, the FDA is politically accountable, just like all other executive agencies, and the government has to be able to speak to its constituents by conveying information in this way. How is it politically accountable? They will be held accountable through the political process. But we don't elect the FDA, and the FDA doesn't seem to adhere to the unitary executive doctrine, does it? So how would it be politically accountable? I'm just, perhaps that's beyond the scope of this case. Do you think it's beyond the scope of this case? But what is the answer? But the public can elect its government officials, and FDA, like other government agencies, have politically accountable heads of the agency who are held accountable by the political process. It's not the role of the courts to fact-check the FDA's scientific statements meant to further their mission to protect the public from dangerous uses of drugs. It would be the executive branch, not the judicial branch? That's how you make a change? Yes, Your Honor. Okay. Thank you so much. Thank you. If there are no further questions, we'd ask the court to affirm. You've saved time for rebuttal. I'm sorry? I said, you have saved time for rebuttal. Thank you. In response to your question earlier, Judge Otterog, about the ultra-virus exception of sovereign immunity, this court recently held in Feds for Medical Freedom on Bonk and allowed an ultra-virus claim to proceed against the federal government. The underlying claim in that case was ultra-virus. To be very clear, ultra-virus is not a waiver by Congress. The ultra-virus doctrine is not a waiver by Congress. It is an exception to sovereign immunity. The court does not need to look to Congress for that waiver. Sovereign immunity does not apply. Even though this court has said in Danos that it is not necessarily the broadest waiver of sovereign immunity, that doesn't change the fact that the FDA had no authority here. The district court spent a significant amount of time on this issue, and so we would ask the court to reach it as well. I would also like to point the court's attention to the Supreme Court's decision in DHS v. Regents, where the court very specifically said that just as the people must turn square corners when they deal with the government, the government should turn square corners in dealing with the people. There's a degree of precision that's required, especially with an agency that claims scientific authority. They shouldn't be playing fast and loose with their— What do you say to opposing counsel who said ruling in your favor would cause a great letdown in the ability of the government to be able to help people avoid the opioid crisis or a NyQuil thing that hurts children or teenagers? The government is incorrect in that assertion. Again, the appellants in this case, the doctors, have not challenged the FDA's ability to communicate when they've received adverse event reports. If they're receiving reports that opioids are causing these difficulties, that NyQuil is causing this harm, then they can report that they've received those adverse events, or that they've received notice of those adverse events. It's when they step beyond that and start telling people how they should or should not be using approved drugs. It's also notable that the government's best exception is a NyQuil case, which is not a prescription drug, from the last year. The government also repeatedly cites its mission statement about making sure the drugs are safe and effective. That mission statement is nothing more than a mission statement. The operative provisions that actually authorize the agency to do anything are contained in the rest of the Federal Food, Drug, and Cosmetic Act. The Supreme Court has been very clear that the mission statements are not freestanding authorization to do whatever they want. And so, if the government, in ensuring that drugs are safe and effective, that process is through the new drug approval process. What about a 375B that was cited in the Proposing Council? 375B on publicity? It says that the Secretary may cause to be disseminated information of imminent danger or health or gross deception.  If they've received adverse event reports, they are welcome to communicate those to the public. That is not an issue. So, they could publicize every single day, if they had them, adverse event reports with this particular drug, if they had them. That's an assuming argument. I'm not disparaging or affirming the drug. And that would be okay, and that's not what you're... There may be additional legal issues with something like that, but as far as this case is concerned, that's not what we are challenging. We'd also like to stress to the Court that the doctors in this case are not asking this Court to break new ground or to take significant leaps. This Court in Avieles and the Supreme Court in FTC v. Standard Oil talk about how pretty much anything an agency does is going to be agency action. That triggers the waiver of sovereign immunity in the APA. In Rider's Guild, this Court recognized that an agency, by raised eyebrows or by job-owning, can exercise agency action to influence the public. Similarly, in Trudeau and Jaffe, those are out-of-circuit cases, but again, they talk about how the waiver of sovereign immunity in 702 was supposed to apply to anything the agency does. These cases are well-established. And then on finality, for the APA claims, the Tazi case out of the D.C. Circuit is a great example that's very similar to this, where an agency made a statement or an agency classified a drug as a carcinogen. And then the Court relied upon how third-party groups would then pressure private entities because of this agency's non-binding action or how it would trigger legal obligations by other entities that were not the agency itself. So is that how you defeat traceability? This is all for the waiver of sovereign immunity, Your Honor. As far as traceability is concerned, again, the plaintiffs are not—or the appellants in this case are not asking the Court to make big steps. In Department of Commerce v. New York, that's a Supreme Court case, the Supreme Court said that if the predictable effect of government action is on—if the predictable effect is the harm that the parties claim, then that's sufficient for traceability, even if the actions of third parties are illogical or unlawful. The holding in Department of Commerce v. New York was very broad. It's very clear that the predictable effect of the FDA's actions were to have this—were to influence the ability—or to stop the— Your time is up, unless one of my— Unless there are more questions, we would ask the Court to reverse. Thank you. Louie, this case is submitted.